Mitchell A. Stephens (11775)
Lara A. Swensen (8493)
JAMES DODGE RUSSELL & STEPHENS, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: 801.363.6363
Email: mstephens@jdrslaw.com
lswensen@jdrslaw.com

*Counsel for Plaintiff Asvalo Real Estate, LLC*

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| ASVALO REAL ESTATE, LLC,<br><br>*Plaintiff,*<br><br>vs.<br><br>STACK REAL ESTATE, LLC,<br><br>*Defendant.* | **COMPLAINT**<br>**(Jury Demand)**<br><br>Case No. 2:23-cv-00728-BSJ<br><br>Judge Bruce S. Jenkins |

Plaintiff Asvalo Real Estate, LLC ("Asvalo"), through its undersigned counsel, hereby files this Complaint against Defendant STACK Real Estate, LLC ("STACK"), and for its claims alleges as follows:

**PARTIES**

1. Asvalo Real Estate, LLC is a Utah limited liability company. Asvalo's only member is domiciled in Texas.

1

2. Upon information and belief, STACK Real Estate, LLC ("STACK"), is a Utah limited liability company with its principal place of business in Lehi, Utah. Upon information and belief, all of Stack's members are domiciled in Utah.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.

## GENERAL ALLEGATIONS

### The Property

4. Asvalo is a real estate company specializing in the development of properties containing multifamily housing units.

5. In December 2019, Asvalo was under contract to purchase just over 20 acres of land that falls within what is known as North Farmington Station, a large commercial development planned around the commuter rail station known as Farmington Station in Farmington City, Utah.

6. Specifically, on or about May 2019, Asvalo was assigned all rights, title and interest to approximately 20.65 acres of land located at 1525 West Burke Lane, Farmington, Davis County, Utah (the "Property") pursuant to an assignment of a Purchase and Sale Agreement for Commercial Real Estate, dated May 1, 2019 (the "Purchase Agreement").

7. Upon information and belief, STACK is a real estate company, which specializes in the development of commercial real estate.

8. Upon information and belief, as of December 2019, STACK was under contract to purchase several other parcels of land that also fall within the North Farmington Station development.

9. Upon information and belief, in December 2019, STACK was interested in purchasing the Property from Asvalo because the Property contains two roads that provide direct access to the other land STACK was under contract to purchase at North Farmington Station. Accordingly, in approximately July 2019, representatives of STACK, including Nathan Ricks and Andrew Bybee, reached out to representatives of Asvalo, including Sean Alibrando, and the parties negotiated STACK's purchase of the Property from Asvalo.

### The Agreement

10. Throughout approximately July through December of 2019, representatives of Asvalo, including Mr. Alibrando, and representatives of STACK, including Mr. Ricks, Mr. Bybee, and Trevor Evans, negotiated STACK's purchase of the Property from Asvalo. The negotiations occurred almost exclusively in person and over the telephone.

11. Ultimately, the parties agreed that Asvalo would assign its rights under the Purchase Contract to STACK for an up-front payment of $500,000, and that within two years, STACK would determine whether to move forward with its purchase of land at North Farmington Station.

12. The parties agreed that if STACK determined to move forward with purchasing land at North Farmington Station, STACK would have two options: STACK could either pay Asvalo an additional purchase price for the Property or STACK could sell a portion of the Property back to Asvalo that was entitled for a multifamily project. If, however, STACK determined not to move forward with purchasing land at North Farmington Station, the parties agreed STACK could

sell its rights to the Property to an unrelated third party, with Asvalo having a right of first refusal to purchase those rights on the same terms STACK offered the unrelated third party.

13. On or around December 31, 2019, Asvalo and STACK reduced their agreement to writing, entering into a Contract Rights Purchase Agreement, dated December 31, 2019 (the "Agreement").

14. Section 8(b) of the Agreement provides that STACK "shall pursue the entitlement of the Property with Farmington City," including "the approval of nine (9) acres of the Property . . . to be developed into multifamily housing." After this approval was obtained, and within two years of the date of the Agreement (and unless STACK elected to sell its rights to the Property to a third party pursuant to Section 8(c)), STACK had two options: STACK must elect to either (i) sell the portion of the Property approved for multifamily back to Asvalo or (ii) pay Asvalo the Additional Purchase Price, as required by the Agreement.

15. Under section 8(c) of the Agreement, if STACK "determine[d] not to complete the purchase of the Property . . . and instead desire[d] to sell its rights under the Purchase Agreement to an unrelated third party," STACK could do so. If STACK pursued this option, Asvalo would have a right of first refusal to purchase the rights "on the same terms and conditions applicable to the proposed sale of such rights to such third party . . . ." To ensure Asvalo was able to exercise this right, the Agreement required STACK to give Asvalo written notice of the terms and conditions of the third party's offer.

16. The concept, in essence, was to defer a portion of the purchase price for the Property until STACK determined whether or not to move forward with purchasing land at North Farmington Station.

17. Upon information and belief, since Asvalo and STACK entered into the Agreement on December 31, 2019, STACK has purchased several parcels of land at North Farmington Station, totaling approximately 108 acres.

18. STACK failed to inform Asvalo of its purchase of the land at North Farmington Station and also failed to pay Asvalo the Additional Purchase Price required by the Agreement.

### STACK Sells the Property to Wasatch

19. On or about September 14, 2020, STACK provided Asvalo with a letter of intent ("LOI") setting forth the terms of a proposed transaction wherein STACK would sell its rights under the Purchase Agreement to Wasatch Residential Group, LLC ("Wasatch Residential").

20. As set forth in the LOI, the proposed transaction would also grant STACK the right to become a limited partner with Wasatch Residential in the development of the Property. The LOI also provided that, in the event Wasatch Residential did not receive entitlements for at least four hundred (400) units within twelve (12) months of the closing, Wasatch Residential had the option to require STACK to purchase back the Property at the purchase price paid by Wasatch Residential (less an escrow holdback amount).

21. Prior to STACK's delivery of the LOI to Asvalo, Mr. Bybee of STACK spoke with Mr. Alibrando of Asvalo and acknowledged STACK's obligations under Section 8(b) of the Agreement. Mr. Bybee asked Mr. Alibrando if Asvalo would be willing to waive STACK's obligations under Section 8(b) or agree to modify them such that STACK would not be required to pay Asvalo the Additional Purchase Price under the Agreement. Mr. Alibrando refused.

22. Upon delivering the LOI to Asvalo, STACK requested that Asvalo inform STACK within five (5) days whether Asvalo would elect to match the terms and conditions of the LOI.

Upon information and belief, by making such a request of Asvalo, STACK intended its delivery of the LOI as the written notice required under Section 8(c) of the Agreement.

23. In a letter dated September 21, 2020, Asvalo notified STACK that the proposed sale, as set forth in the LOI, was not a sale to an unrelated third party within the meaning of Section 8(c), as that term was understood and agreed to by both parties before and after the Agreement was signed. The LOI not only granted STACK the right to become a limited partner with Wasatch Residential in the development of the Property, it also included an option for STACK to buy back the Property.

24. On or about September 22, 2020, STACK delivered another letter to Asvalo, through its new attorneys. In that letter, STACK asserted that "Wasatch is completely unrelated to STACK, and any business relationship they may form over the coming months or years doesn't change the fact that the assignment will be made in a few days from one unrelated party to another." Attached to the letter was a new proposed agreement entitled Contract Rights Purchase Agreement between STACK and an entity called Wasatch Farmington Holdings, LLC ("Wasatch Farmington Holdings").

25. STACK's September 22, 2020, letter also purported to address the concerns raised by Asvalo in its September 21, 2020 letter. First, STACK pointed out that the new proposed agreement omitted the provision that would have granted STACK the right to become a limited partner in development of the Property. Second, while the option for STACK to buy back the Property remained in the new agreement, in an effort to "assuage Asvalo's concerns" that the provision was "being included in the Wasatch deal to circumvent STACK's obligations under

Section 8 of the Agreement," STACK assured Asvalo that if STACK did end up buying back the Property, "STACK will honor its obligations under Section 8(b) of the Agreement."

26. STACK's newly-proposed Contract Rights Purchase Agreement, however, provided that STACK would continue to pursue a development agreement and master plan for the Property and other land STACK owned at North Farmington Station. In other words, the terms of the proposed Contract Rights Purchase Agreement made clear that STACK owned and planned to develop several parcels of land falling within North Farmington Station. Accordingly, even with the changes and assurances STACK made to Asvalo, the sale of the Property from STACK to Wasatch Farmington Holdings under the Contract Rights Purchase Agreement did not constitute a sale to an "unrelated third party" under section 8(c) of the Agreement, as the parties understood and agreed to when they entered into the Agreement.

27. On or about September 25, 2020, Asvalo sent a final letter to STACK, in which Asvalo informed STACK that despite the modifications, the proposed sale did not constitute a sale to an "unrelated third party" within the intended meaning of the Agreement. Because "the Agreement does not ascribe a specific meaning to the term 'unrelated third party,'" Asvalo wrote, "the discussions, correspondence, and course of dealing between the principals of Asvalo and S[TACK] inform the meaning of this term as it is used in the Agreement." The discussions, correspondence, and course of dealing between Asvalo and STACK contemplated that a sale to an unrelated third party under Section 8(c) of the Agreement only occurred if STACK "decided to walk away from" the purchase (and later development) of any property at North Farmington Station. In short, Asvalo informed STACK that if the sale as proposed took place, the Additional

7

Purchase Price set forth in Section 8(b) of the Agreement would be due and owing by STACK to Asvalo.

28. On or about October 1, 2020, STACK sent Asvalo a final letter stating that a sale of STACK's rights to the Property to an affiliate of Wasatch "has been completed." In the letter, STACK reiterated its position that "STACK has no further obligations to Asvalo under Section 8 of the Agreement."

29. Upon information and belief, STACK actually sold and transferred its rights under the Agreement to a company called MTSE HOLDINGS 2020010 LLC through a Special Warranty Deed dated September 30, 2020.

30. STACK never disclosed to Asvalo the sale and transfer of its rights under the Agreement to MTSE HOLDINGS 2020010 LLC. In other words, STACK never provided Asvalo with the written notice required by section 8(c) of the Agreement, which would have enabled Asvalo to exercise its right of first refusal under the Agreement in connection with STACK's sale and transfer of its rights under the Agreement to MTSE HOLDINGS 2020010 LLC.

31. Upon information and belief, on or around November 20, 2020, MTSE HOLDINGS 2020010 LLC conveyed the Property to Wasatch Farmington Holdings.

**STACK Continues to Own and develop Land at North Farmington Station**

32. Upon information and belief, on or about December 4, 2020, STACK and Wasatch Farmington Holdings jointly executed a Development Agreement for North Farmington Station

("Development Agreement") with Farmington City for the purpose of developing land they own within North Farmington Station.[1]

33.  In the Development Agreement, STACK and Wasatch Farmington Holdings are singularly referred to as "Developer."

34.  The terms of the Development Agreement do not differentiate between STACK and Wasatch Farmington Holdings.

35.  Further, all notices required to be given to the Developer under the Development Agreement are to be sent to "STACK Real Estate, LLC," to the attention of "Andrew Bybee or Trevor Evans" at STACK's principal offices in Lehi, Utah—not to Wasatch Farmington Holdings.

36.  Under the Development Agreement, the Developer (STACK and Wasatch Farmington Holdings), state that they own "approximately 128 acres of land," including the 108-acres owned by STACK and the Property, which they "desire[] to develop . . . pursuant to the City's Land Use Master Plan and the City's Ordinances, as a Class A office park and S.M.A.R.T (Sustainable, Mixed Use, Attractive, Realistic, Transit-Oriented) community including office, multi-family apartments, and supporting retail and complementary uses, to be known as 'North Farmington Station.'"

---

[1] Although drafts of the Development Agreement were with "Stack Real Estate, LLC," it appears the entity that executed the Development Agreement is referred to as STACK Farmington Land, LLC. A business registration search on the website of the Utah Division of Corporations and Commercial Code, www.corporations.utah.gov, shows that STACK Real Estate, LLC and STACK Farmington Land, LLC share the same business address in Lehi, Utah. Further, under the Development Agreement, all notices required under the Development Agreement are to be sent to STACK Real Estate, LLC, attention Mr. Bybee or Mr. Evans. Accordingly, STACK Real Estate, LLC and STACK Farmington Land, LLC are referred to collectively herein as "STACK."

37. Upon information and belief, in addition to the Development Agreement, an agreement entitled Agreement for Development of Land (ADL) ("ADL") was entered into on or about December 4, 2020, which also governs the development of the property at North Farmington Station. That agreement is between the Redevelopment Agency of Farmington City, Farmington City, STACK, and Wasatch Farmington Holdings.

38. The ADL states that "Wasatch [Farmington Holdings] is a party to this Agreement as a land owner of certain property within the Site"[2] and "[i]t is contemplated and agreed that certain benefits of this Agreement may be realized by [STACK] through the undertakings of Wasatch." The ADL further states "that the development of property owned by Wasatch [Farmington Holdings] will be undertaken pursuant to the terms of the Development Agreement between the parties of the same date as this Agreement."

39. Under the ADL, STACK is set to receive what is referred to as a "Maximum Aggregate Incentive" for development of the property within North Farmington Station, which totals $34,000,000. There is no provision in the ADL for Wasatch Farmington Holdings to receive any incentive whatsoever.

40. Further, in correspondence, reports, plans, and other documents related to the development of North Farmington Station, which were obtained by Asvalo in response to a public records request filed with Farmington City, representatives of STACK, Farmington City and other parties involved in the development of North Farmington Station, refer to the Property as being

---

[2] The ADL defines the term "Site" to specifically include the "Wasatch Property."

owned by STACK or "S[TACK] Real Estate and Wasatch Residential Group" and as being developed by STACK, Wasatch, or "STACK Real Estate and Wasatch Residential."

41. Indeed, the correspondence, reports, plans, and other documents obtained by Asvalo show that STACK, Farmington City, and others involved in the development of North Farmington Station often refer to STACK and Wasatch Farmington Holdings as if they are interchangeable, e.g., by referring to the companies as "STACK/Wasatch."

42. The correspondence, reports, plans, and other documents also show that representatives of STACK, including Mr. Evans and Mr. Bybee, continue to oversee the development of the property STACK and Wasatch Farmington Holdings own at North Farmington Station.[3]

43. As recently as July 22, 2022, STACK and its members, Trevor Evans and Andrew Bybee, have been identified as "stakeholders" in the property and its development.

## FIRST CAUSE OF ACTION

### Declaratory Relief Under Utah Code §§ 78B-6-401, -402, and -408

44. Asvalo repeats and realleges each allegation contained in the preceding paragraphs as though set forth fully herein.

45. Asvalo has a legally protected interest in the Agreement, including but not limited to (1) right to written notice of the terms and conditions of STACK's sale and transfer of its rights under the Agreement to MTSE HOLDINGS 2020010 LLC, which would have enabled Asvalo to

---

[3] Mr. Ricks also continued to oversee the development of the property until he passed away in January 2023.

exercise its right of first refusal, as set forth by Section 8(c) of the Agreement; and (2) the right to receive from STACK payment of the Additional Purchase Price, as required by Section 8(b) of the Agreement.

46.     An actual controversy that is ripe for judicial determination has arisen and now exists between Asvalo and STACK by virtue of the conduct alleged herein as set forth more fully above, including as a result of STACK's failure to fulfill its contractual obligations to provide written notice of the terms and conditions of STACK's sale and transfer of its rights under the Agreement to MTSE HOLDINGS 2020010 LLC such that Asvalo could exercise its right of first refusal, as set forth by Section 8(c) of the Agreement; and STACK's failure to pay Asvalo the Additional Purchase Price required by Section 8(b) of the Agreement.

47.     Pursuant to Utah Code §§ 78B-6-401, -402, and -408, Asvalo is entitled to a declaration determining Asvalo's rights with respect to the foregoing.

48.     Asvalo seeks a declaration from this Court that (a) STACK's conduct, as alleged herein, is in breach of the Agreement, (b) that STACK failed to fulfill its contractual obligations to provide notice of the terms and conditions of STACK's sale and transfer of its rights under the Agreement to MTSE HOLDINGS 2020010 LLC such that Asvalo could exercise its right of first refusal, as set forth in Section 8(c) of the Agreement, (c) that STACK is obligated to pay Asvalo the Additional Purchase Price required under Section 8(b) of the Agreement, and (d) that Asvalo is entitled to recoup its attorneys' fees and costs pursuant to Section 14(f) of the Agreement.

## SECOND CAUSE OF ACTION

### Breach of Contract

49. Asvalo repeats and realleges each allegation contained in the preceding paragraphs as though set forth fully herein.

50. The Agreement is a binding and enforceable agreement between Asvalo and STACK.

51. Asvalo fully performed its obligations under the Agreement.

52. STACK materially breached the Agreement by virtue of the conduct alleged herein as set forth more fully above, including by failing to provide written notice of the terms and conditions of STACK's sale and transfer of its rights under the Agreement to MTSE HOLDINGS 2020010 LLC such that Asvalo could exercise its right of first refusal, as set forth under Section 8(c) of the Agreement; and by refusing to pay Asvalo the Additional Purchase Price required under Section 8(b) of the Agreement.

53. Further, a covenant of good faith and fair dealing inheres in the Agreement, pursuant to which STACK impliedly promised that it would not intentionally or purposefully do anything that would destroy or injure Asvalo's right to receive the fruits of the Agreement.

54. STACK breached that covenant as well, by virtue of the conduct alleged herein as set forth more fully above. STACK has failed to live up to its contractual obligations, has frustrated the purposes for which the Agreement was signed by Asvalo, and has otherwise not acted in good faith, denying Asvalo the benefit of its bargain.

55. As a direct and proximate result of the material breaches by STACK, Asvalo has suffered actual and consequential damages in an amount to be determined at trial, but not less than the amount equal to the Additional Purchase Price required under Section 8(b) of the Agreement, which totals approximately $2,417,140.

56. Asvalo is also entitled to recoup its attorneys' fees and costs pursuant to Section 14(f) of the Agreement.

## THIRD CAUSE OF ACTION

### Promissory Estoppel (In the Alternative)

57. Asvalo repeats and realleges each allegation contained in the preceding paragraphs as though set forth fully herein.

58. Asvalo hereby pleads this cause of action in the alternative in the event the Agreement is found unenforceable or of no effect in whole or in part, leaving Asvalo with no adequate remedy at law.

59. STACK made numerous promises to Asvalo, including without limitation that it would provide written notice of the terms and conditions of any proposed sale of its rights under the Agreement, such that Asvalo could exercise a right of first refusal to purchase those rights on the same terms and conditions; and pay Asvalo an additional purchase price for the Property in the event STACK determined to move forward with the purchase of land at North Farmington Station.

60. Asvalo acted with prudence and in reasonable reliance on STACK's promises.

61. STACK knew Asvalo would rely and had relied on STACK's promises, which STACK knew or should have known would induce action or forbearance by Asvalo.

62. STACK was aware of all material facts.

63. Asvalo relied on STACK's promises, and such reliance has damaged Asvalo in an amount to be proven at trial, but not less than $2,417,140.

### JURY DEMAND

Asvalo demands a jury on all issues so triable.

# **PRAYER FOR RELIEF**

WHEREFORE, Asvalo prays for Judgement against STACK as follows:

1. For general, compensatory, actual, and/or special damages in an amount to be proven at trial, but not less than $2,417,140;

2. For attorneys fees and costs;

3. For pre- and post-judgment interest on all damages at the maximum rate allowed by law;

4. For a declaration from this Court that, among other things: (a) STACK's conduct, as alleged herein, is in breach of the Agreement, (b) that STACK failed to fulfill its contractual obligations to provide written notice of the terms and conditions of STACK's sale and transfer of its rights under the Agreement to MTSE HOLDINGS 2020010 LLC such that Asvalo could exercise its right of first refusal, as set forth in Section 8(c) of the Agreement, (c) that STACK is obligated to pay Asvalo the Additional Purchase Price required under Section 8(b) of the Agreement, and (d) that Asvalo is entitled to recoup its attorneys' fees and costs pursuant to Section 14(f) of the Agreement; and

5. For such other and further relief as this Court deems reasonable and just.

DATED this 11th day of October, 2023.

JAMES DODGE RUSSELL & STEPHENS, P.C.

/s/ Mitchell A. Stephens

Mitchell A. Stephens

Lara A. Swensen

*Attorneys for Plaintiff Asvalo Real Estate, LLC*